UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
DES MOINES DIVISION
Civil Action No. 4:12-cv-00102-RP-TJS

ALAN TODD BROWN, individually and
on behalf of all others similarly situated,

Plaintiff,

v.

LOUISIANA-PACIFIC CORPORATION,

Defendant.

**PLAINTIFF'S AMENDED
CLASS ACTION COMPLAINT
Demand for Jury Trial**

Plaintiff Alan Todd Brown ("Plaintiff"), by and through his undersigned counsel, on

behalf of himself and all other persons and entities similarly situated ("Class Members"), and as

a matter of right within the time prescribed pursuant to FRCP R. 15(a)(1)(B) and LR 15, hereby

amends his Complaint and alleges the following facts and claims upon knowledge as to matters

relating to himself and upon information and belief as to all other matters and, by way of this

Amended Complaint, avers as follows:

## INTRODUCTION AND SUMMARY OF ACTION

1.      This is an action asserting negligence and unfair and deceptive acts and practices,

and seeking declaratory relief, in connection with defective Trimboard designed, manufactured,

marketed, advertised, warranted and sold by Louisiana-Pacific Corporation and its subsidiary,

ABT Building Products Corporation a/k/a ABTCO (hereinafter collectively referred to as

"ABTCO," "LP" and/or "Defendant").

2.      Upon information and belief, Defendant designed, manufactured, tested,

marketed, sold and distributed to Plaintiff, his contractors, or agents, a manufactured wood

exterior trim product known as ABTCO Trimboard (hereinafter "Trimboard" or "product") for

use as fascia, soffit, corner board, bandboards, window trim, door trim and general exterior use on homes, apartments, condominiums, buildings, and other structures in Iowa and throughout the United States.

3.     Defendant knew or should have known the Trimboard was defective in design and manufacture, was not fit for its ordinary and intended use, and did not perform in accordance with the advertisements, marketing materials and warranties disseminated by Defendant, or within the reasonable expectations of ordinary consumers.

4.     At the time of sale, the Trimboard contained design and manufacturing defects that result in deterioration.   The defects reduce the effectiveness and performance of the Trimboard and rendered it unable to perform the ordinary purposes for which it is used in exterior applications.   However, despite knowing this information, and Trimboard's defective condition, LP continued to sell Trimboard to Plaintiff, Class Members, and/or Plaintiff's and Class Members' builders and subcontractors for exterior use without adequate warning of its limitations.

5.     As a result of the defects in Trimboard, Plaintiff and the Class Members have suffered damages, in that Trimboard has been installed on their homes, offices, or other buildings, either by them or by their contractors or subcontractors, that they would not otherwise have had if they had originally known of the defects.

## JURISDICTION AND VENUE

6.     This action is within the original jurisdiction of this Court by virtue of 28 U.S.C. § 1332(d)(2).   The Plaintiff is a citizen of a different state from Defendant, and the amount in controversy of this class action exceeds five million dollars ($5,000,000.00), exclusive of interest and costs.

7.     Venue for this action is properly laid in this Court pursuant to and in accordance with 28 U.S. C. § 1391.

## THE PARTIES

8.     Plaintiff is a citizen and resident of Urbandale, Iowa, which is a city in Polk and Dallas Counties.  Specifically, Plaintiff resides at 15711 Brookshire Drive, Urbandale, Iowa ("Plaintiff's residence"), and this home is the subject of this Complaint.  Plaintiff's home was built in 2004.

9.     Defendant Louisiana-Pacific Corporation is a corporation organized and existing under the laws of the State of Delaware, with its headquarters located in Nashville, Tennessee. ABT Building Products Corporation, a/k/a ABTCO, was a subsidiary of Louisiana-Pacific Corporation, but now it is simply a registered trademark and no longer an active corporation. Defendant holds itself out to both the construction industry and the public at large as being knowledgeable in the design and manufacture of exterior building products and as being a provider of quality building products, including the exterior trim product that is the subject of this litigation.

## FACTUAL ALLEGATIONS

10.     ABTCO designed, tested, manufactured, marketed, advertised, warranted and/or sold Trimboard directly or indirectly (through authorized dealers and retail outlets), millions of linear feet of Trimboard throughout Iowa and throughout the United States to owners, developers, contractors and/or subcontractors.

11.     LP is both a manufacturer and a seller of Trimboard pursuant to Iowa Code § 554.2103.

12.     LP, through a distributor, marketed, advertised, warranted and sold Trimboard to

3

Plaintiff through Plaintiff's builders, subcontractors, and/or agents, and the Trimboard was purchased by Plaintiff's builder, Bryan Clark Homes, LLC, after obtaining authority from Plaintiff to do so based upon representations of the suitability and cost of the product, and approximately 1328 linear feet of Trimboard was later installed on Plaintiff's home as window, door, corner, fascia, frieze, and other exterior trim by a subcontractor of Plaintiff's builder.

13.    LP, through a wholesaler or distributor, marketed, advertised, warranted and sold Trimboard to Class Members and Class Members' builders, contractors, subcontractors, and/or agents, and the Trimboard was installed on Class Members' structures.

14.    LP provided an express warranty to Plaintiff and Class Members and the owners of the structures on which Trimboard was installed and/or applied. A true and accurate copy of at least one version of the warranty from 2004 is attached hereto as **Exhibit A** and incorporated herein by reference. Although this warranty ostensibly protected the ultimate consumer, i.e., the owner of a structure clad with Trimboard, the consumer, in most cases, would not have been aware of the warranty because it was only included in bundles of Trimboard sent to the wholesaler or distributor and was most likely not passed on through the chain of distribution to the consumer.

15.    In conjunction with each sale, and through various forms of media, LP marketed, advertised and warranted that the Trimboard was fit for the ordinary purpose for which such goods were used and was free from defects in materials and workmanship.

16.    Specifically, in its materials, ABTCO marketed, advertised and warranted the following:

a.    "Trimboard is recommended for use where any high-quality, nonstructural trim lumber is required."

4

b.    "Use Trimboard for all of your non-structural trim lumber needs."

c.    "Trimboard is intended for use as nonstructural trim, fascia, corner board, soffit, rake board, and bandboard lumber."

d.    "Louisiana-Pacific Corporation (LP) warrants its Trimboard, exclusive of finish, against delamination, checking, splitting, cracking and chipping of the basic substrate for a period of ten years from the date of installation under normal conditions of use and exposure, providing the trim is properly stored, installed, maintained, and protected as specified in LP's Application Instructions."

17.    LP knew that Plaintiff, by and through Plaintiff's builders, Plaintiff's subcontractors, and/or agents, as well as Class Members (if they purchased Trimboard directly from a distributor), and/or Class Members' builders, contractors, subcontractors, and/or agents, would rely upon LP's representations, marketing and warranties regarding the quality of Trimboard.

18.    Plaintiff, by and through Plaintiff's builders, Plaintiff's subcontractors, and/or agents, as well as Class Members (if they purchased Trimboard directly from a distributor), and/or Class Members' builders, contractors, subcontractors, and/or agents, relied upon LP's representations, marketing and warranties when purchasing the Trimboard.

19.    Contrary to LP's representations, however, Trimboard delaminates, checks, splits, cracks, and chips under normal conditions of exterior use and exposure. Indeed, Trimboard, at the time of leaving LP's control, was defective because it prematurely deteriorates, rots, swells, buckles, delaminates, absorbs water, warps, and/or bulges under normal exterior conditions and natural, outdoor exposure; causes consequential water and structural damages; and promotes the growth of mold, mildew, fungi, and insect infestation in the structures in which it is installed.

These defects reduced the effectiveness and performance of the Trimboard and rendered it unable to perform the ordinary purposes for which it was used in exterior applications.

20. LP also failed to provide adequate instructions for the installation of the Trimboard for exterior use. See sample instructions from 2004 attached hereto as **Exhibit B** and incorporated herein by reference. For example, the ABTCO installation instructions are totally devoid of any reference to the need to seal and to prime "site-cut" ends of the Trimboard. Trimboard was manufactured and shipped in sixteen foot (16 ft.) long boards. However, exterior trim is rarely installed on structures in sixteen foot intervals. "Site-cut" means sawing the Trimboard at the construction site to the size needed for its actual application to structures. Even when Trimboard is installed upon exteriors subject to applicable building codes and construction practices typical in the industry, "site-cut" ends are particularly vulnerable to the entry and entrapment of water through natural and foreseeable capillary action, which in turn leads to the product's demise. Defendant knew that Plaintiff, Plaintiff's builders, installers or agents would have to cut the Trimboard to size on site, resulting in "site-cut" ends, yet Defendant failed to provide adequate instructions as to the need to seal and to prime the site-cut ends of Trimboard.

21. LP's installation instructions are also misleading and, in some cases, contrary to advisable construction practices, specifically as they relate to flashing and caulking.

22. Plaintiff and the Class Members, or Plaintiff's and Class Members' builders and subcontractors and agents, utilized and followed the installation instructions provided by ABTCO for the installation of the Trimboard that they purchased from ABTCO or its distributors in the construction of Plaintiff's home and the structures of the Class. Alternatively, LP wrongly assumed that typical construction site workers would read, understand, and implement the complex instructions supplied.

6

23.     Even when standard construction practices are used to install Trimboard, LP's Trimboard is inherently defective for exterior use and fails to perform as intended because it prematurely deteriorates, rots, swells, buckles, delaminates, absorbs water, warps, and/or bulges under normal conditions and natural, outdoor exposure; causes consequential water and structural damages; and promotes the growth of mold, mildew, fungi, and insect infestation in the structures in which it is installed.

24.     Plaintiff's defective Trimboard was installed on the outside of his home by subcontractors, and began to rot and led to water leakage and damage to the Trimboard and, upon information and belief, other building components of Plaintiff's home, including but not limited to components installed after initial construction of Plaintiff's home and at Plaintiff's sole expense.

25.     Upon information and belief, at the time of purchase and/or installation of the Trimboard on Plaintiff's home, the Trimboard warranty provided only that "LP will compensate the owner for repair and replacement of the affected trim no more than twice the original purchase price of the affected trim if failure occurs within ten years."

26.     Plaintiff first discovered damage to his Trimboard in April, 2010. Plaintiff filed a warranty claim with LP in 2010. Instead of providing Plaintiff with an offer to replace the defective Trimboard, LP effectively denied the claim by offering only $197.67 as a settlement. Plaintiff was forced to spend approximately $1,700.00 of his own money to repair and replace the damage caused by the defective Trimboard after rejecting LP's "offer."

27.     LP has repeatedly denied valid warranty claims made by homeowners throughout the country with regard to their defective Trimboard, routinely making statements such as, "Based upon the information received, we do not find a warrantable issue with your trim.

7

However, it may be time for routine homeowner maintenance."

28. LP has failed to resolve warranty claims throughout the country, and those claims have previously led to certified breach of warranty class actions in other federal jurisdictions. *See, e.g., Hart v. Louisiana-Pacific Corporation*, No. 2:08-CV-00047-BO (E.D.N.C., filed Oct. 22, 2008); *Brunson v. Louisiana-Pacific Corp.*, 266 F.R.D. 112 (D.S.C. 2010); and *Thomas v. Louisiana-Pacific Corp.*, 246 F.R.D. 505 (D.S.C. 2007).

29. Upon information and belief, there may be many thousands of structures in Iowa containing defective Trimboard.

### LP'S KNOWLEDGE OF TRIMBOARD'S DEFECTS

30. Trimboard has been manufactured since the mid 1990's at the Roaring River plant in North Carolina, owned and operated at the time by ABTCO. The basic composition of Trimboard has remained the same from its inception through mid-April 2008, when LP stopped its manufacture.

31. In approximately 1999, LP acquired ABTCO, and continued, under ABTCO's name, to manufacture Trimboard and the related ABTCO hardboard siding, from which Trimboard is made.

32. Defendant knew early in the product's life that Trimboard might have a problem when exposed to normal exterior moisture conditions. Tellingly, the warranty in effect from 1999-2001 warned that Trimboard should not be exposed to sources of moisture common to the exterior environment such as lawn sprinklers and "rain," a clear admission that Trimboard was not fit for exterior use and that Defendant knew of this defect.

33. In the early 1990s, hardboard siding began to experience widespread failures throughout the country.

8

34.	In 1992, the federal Office of Housing and Urban Development ("HUD") announced that it might ban the use of hardboard siding in, at least, the state of Florida.

35.	Fearing a possible ban of their hardboard products, the various manufactures of hardboard siding in the United States, including ABTCO, swung into action.

36.	By and through their trade organization, the American Hardboard Association ("AHA"), the hardboard siding manufacturers formed a "Task Force" to respond to the growing concern over, and possible ban of, hardboard siding.

37.	Upon information and belief, the AHA "Task Force" was organized and/or principally led by a long-time employee of ABTCO's Siding Division located at Roaring River.

38.	Upon information and belief, the AHA "Task Force" and its manufacturer-members, including ABTCO, eventually "agreed" to an "action plan" of unity among the hardboard manufacturers developed by ABTCO's employee, which agreed:

    a.	To refrain from reporting laboratory test results of "some [hardboard] sidings which show[ed] better resistance than others";

    b.	To refrain from "brag[ging]" about these differences in performance in laboratory tests, and

    c.	Instead, to "[d]evelop a positive position statement, based upon . . . . test results, that all members can refer to."

39.	Despite the AHA "Task Force" efforts to sanitize and homogenize reporting of performance results of hardboard products, in the late 1990s and early 2000s, ABTCO's hardboard siding, with the identical composition as Trimboard, was the subject of numerous lawsuits alleging that the siding was susceptible to premature degradation and failure due to excessive moisture absorption. These cases resulted in a national class settlement for the siding

9

(non-trim) product.

40.   Although Trimboard was created through simply gluing together two pieces of defective hardboard siding, ABTCO and LP continued to manufacture Trimboard for use as exterior trim and market it as superior to other wood products long after the problems with hardboard siding became well-known and the subjection of multi-million dollar class action settlements.

41.   By 2003, LP internally acknowledged serious concerns related to long term liability for its Trimboard product in the Southeastern United States.  Indeed, the vast majority of all warranty claims filed against LP through 2005 were concerning moisture degradation of Trimboard.

42.   By 2004, LP decided it should no longer sell Trimboard in high humidity markets in favor of instead selling its own superior product, "SmartSide."

43.   SmartSide was a superior product that LP knew would resist decay and rot far better than Trimboard.  SmartSide siding and trim, developed by ABTCO in the late 1990s, had a different composition from Trimboard and was treated with a decay inhibitor, zinc borate, to protect against moisture degradation, insects, and fungal decay.

44.   SmartSide products were so superior to Trimboard that they came with a 30-year warranty that included a 100% labor and materials feature for the first 7 years.

45.   Nonetheless, Defendant decided to shift production at Roaring River from hardboard siding to Trimboard, and then from Trimboard to SmartSide trim, gradually over a number of years.   Initially, considering the problems facing hardboard siding, including the numerous lawsuits that had been filed, the decision was made in 2000 to shift the product mix at Roaring River to trim products.

10

46. Eventually, because of its substantial investment in the Roaring River plant and operation, and the cost to shut production down (approximately $37 million), LP developed its "last man standing" strategy, under which Roaring River would continue to produce, and LP would continue to sell, Trimboard through 2008. Thus, LP would manufacture defective Trimboard at Roaring River, and sell the product to the public, while its competitors, who manufactured similar products, phased out their production due to the products' poor reputation or were driven out of business by LP's monopoly power in the market.

47. As part of this plan, LP also considered SmartSide to be a competitor of Trimboard and determined that SmartSide's marketing should be limited in order to maximize sale of Trimboard products. Thus, for a period of at least 8 years, LP marketed and sold to Plaintiff and Class Members a product it knew, or should have known, was defective and inferior to its own SmartSide trim products, while, at the same time issuing an express warranty that it knew or should have known would rarely reach the consumer and which was primarily intended to limit ABTCO's and LP's liability.

48. In addition to the known failures in Trimboard, the product failed to meet applicable national standards for exterior medium density fiberboard products and was defective from the time it left the Roaring River plant.

## CLASS ACTION ALLEGATIONS

49. Plaintiff brings this class action pursuant to Fed. R. Civ. P. 23 on behalf of himself and the following Damages Class and Declaratory Relief Class (collectively the "Classes") as defined as follows:

> Damages Class
> All persons and entities that own a structure located within the State of Iowa in which LP's Trimboard is installed on the exterior and who have not had their Trimboard replaced

11

or been compensated for their losses in full by Defendant.

<u>Declaratory Relief Class</u>
All persons and entities that own a structure located within the State of Iowa in which LP's Trimboard is installed on the exterior.

Excluded from the Classes are: (a) any Judge or Magistrate presiding over this action and members of their families; (b) LP and any entity in which LP has a controlling interest or which has a controlling interest in LP and its legal representatives, assigns and successors of LP; and (c) all persons who properly execute and file a timely request for exclusion from the Classes.

50. *Numerosity*: The Classes are composed of thousands of persons geographically dispersed throughout the state of Iowa, the joinder of whom in one action is impractical. Moreover, upon information and belief, the Classes are ascertainable and identifiable from LP records or identifying marks on and/or characteristics of the Trimboard.

51. *Commonality*: Questions of law and fact common to the Classes exist as to all members of the Classes and predominate over any questions affecting only individual members of the Classes. These common legal and factual issues include the following:

a. Whether Trimboard is defective in design and manufacture for exterior use;

b. Whether Trimboard has not performed or will not perform in accordance with the reasonable expectations of ordinary consumers for exterior use;

c. Whether LP was negligent in its design and manufacture of the Trimboard for exterior use;

d. Whether LP violated the Iowa Private Right of Action for Consumer Frauds Act by failing to disclose the defect in the Trimboard and by continuing to sell the

defective Trimboard even after it knew of the defect in the Trimboard;

       e.      Whether LP violated the Iowa Private Right of Action for Consumer Frauds Act by failing to offer to pay for 100% of the costs associated with the removal of the faulty Trimboard and installation of the replacement Trimboard when its own express warranty represented that it would assume 100% of the cost of the replacement;

       f.      Whether LP knew or should have known of the defects;

       g.      Whether LP concealed from consumers and/or failed to disclose to consumers the defect;

       h.      Whether Plaintiff and the Classes are entitled to compensatory damages, including, among other things: (i) compensation for all out-of-pocket monies expended by members of the Classes for replacement of Trimboard and/or installation costs; (ii) the failure of consideration in connection with and/or difference in value arising out of the variance between the Trimboard as warranted and the Trimboard containing the defect; and (iii) the diminution of resale value of the structures containing the Trimboard resulting from the defect.

       i.      Whether Plaintiff and the Classes are entitled to replacement of their defective Trimboard with non-defective exterior trim;

       j.      Whether Plaintiff and the Classes are entitled to restitution and/or disgorgement;

       k.      Whether the installation instructions for Trimboard were deficient; and

       l.      Whether Plaintiff and members of the Declaratory Relief Class are entitled to declaratory relief.

52.    *Typicality*:  Plaintiff's claims are typical of the claims of the members of the Classes, as all such claims arise out of LP's conduct in designing, manufacturing, marketing,

advertising, warranting and selling the defective Trimboard, LP's conduct in concealing or failing to disclose the defects in the Trimboard, and Plaintiff and Class Members' purchasing structures clad with the defective Trimboard.

53. *Adequate Representation*: Plaintiff will fairly and adequately protect the interests of the members of the Classes and has no interest antagonistic to those of the Classes. Plaintiff has retained counsel experienced in the prosecution of complex class actions, including consumer class actions involving breach of warranties, product liability, product design defects, inadequate product warning, negligence, and unfair and deceptive trade practices.

54. *Predominance and Superiority*: This class action is appropriate for certification because questions of law and fact common to the members of the Classes predominate over questions affecting only individual members, and a Class action is superior to other available methods for the fair and efficient adjudication of this controversy, since individual joinder of all members of the Classes is impracticable. Should individual Class Members be required to bring separate actions, this Court and Courts throughout Iowa would be confronted with a multiplicity of lawsuits burdening the court system while also creating the risk of inconsistent rulings and contradictory judgments. In contrast to proceeding on a case-by-case basis, in which inconsistent results will magnify the delay and expense to all parties and the court system, this class action presents far fewer management difficulties while providing unitary adjudication, economies of scale and comprehensive supervision by a single Court.

## ESTOPPEL FROM PLEADING
## AND TOLLING OF APPLICABLE STATUTES OF LIMITATIONS

55. All conditions precedent for filing this Amended Complaint have been satisfied. Plaintiff's original Complaint was filed prior to the expiration of any applicable statutes of limitations or statutes of repose, and this Amended Complaint relates back thereto, or Defendant

is estopped, as set forth below, from asserting such defenses.

56.     Defendant is estopped from relying on any statutes of limitation or repose by virtue of its acts of fraudulent concealment. Upon information and belief, Defendant has known of the defect in the Trimboard for exterior use for years and has concealed from owners of the Trimboard and/or failed to alert the owners to the defective nature of the Trimboard for exterior applications.

57.     Given Defendant's failure to disclose this non-public information about the defective nature of the Trimboard for exterior use – information over which it had exclusive control – and because Plaintiff and Class Members therefore could not reasonably have known that Trimboard was defective for such use, Defendant is estopped from relying on any statutes of limitations or repose that might otherwise be applicable to the claims asserted herein.

## COUNT I – Negligence

58.     Plaintiff realleges and incorporates each of the preceding allegations as though fully set forth herein.

59.     Defendant owed a duty to Plaintiff and members of the Classes to design and manufacture Trimboard that was free of latent defects that would cause the Trimboard to prematurely fail when used in exterior applications.

60.     Defendant also owed a duty to Plaintiff and members of the Classes to determine that the Trimboard contained latent defects, to inform them of said defects, and to correct said defects prior to continued sales of the Trimboard for exterior use.

61.     Defendant failed to exercise ordinary and reasonable care in the design and manufacture of the Trimboard and in determining whether the Trimboard that it sold, and continued to sell, contained a latent defect that would result in the failure of the Trimboard to

perform as reasonably expected when used in typical and customary exterior applications.

62.     Defendant failed to exercise ordinary and reasonable care, as aforesaid, that proximately caused damages to Plaintiff and members of the Classes who have not exercised, or sought to exercise, or been eligible to exercise any contractual or warranty claims with respect to their defective Trimboard.

63.     Plaintiff and members of the Classes have suffered damages as a result of Defendant's actions.

## COUNT II – Fraudulent Misrepresentation

64.     Plaintiff realleges and incorporates each of the preceding allegations as though fully set forth herein.

65.     LP falsely and fraudulently represented to Plaintiff, the Class members, and/or the consuming public in general that LP's Trimboard would be free from defects and fit for its customary and normal use.

66.     Those representations made by LP were, in fact, false.

67.     When said representations were made by LP, upon information and belief, they knew those representations to be false and they willfully, wantonly, and recklessly disregarded whether the representations were true.

68.     These representations were made by LP with the intent of defrauding and deceiving the Plaintiff, the Class members and/or the consuming public, all of which evinced reckless and willful indifference to the safety and welfare of the Plaintiff and the Class members.

69.     At the time the aforesaid representations were made by LP, Plaintiff and the Class members were unaware of the falsity of said representations and reasonably believed them to be true, and the representation were material to Plaintiff and the Class Members in using Trimboard.

70. In reliance upon said representations, the Plaintiff's and Class members' properties were built using LP's Trimboard and/or Trimboard was installed and used on Plaintiff's and the Class members' properties thereby sustaining damage and injury and/or being at an increased risk of sustaining damage and injury in the future.

71. LP knew and was aware, or should have been aware, that LP's Trimboard was defective and not fit for its customary and normal use.

72. LP knew, or should have known, that LP's Trimboard had a potential to, could, and would cause severe damage and injury to property owners.

73. LP brought its Trimboard to the market and acted fraudulently, wantonly, and maliciously to the detriment of the Plaintiff and the Class members.

74. Plaintiff did not first discover the fraudulent misrepresentations of Defendant alleged herein until 2010.

75. By reason of the foregoing, Plaintiff and the Class members suffered, and continue to suffer, financial damage and injury.

## COUNT III - Unfair or Deceptive Acts or Practices

76. Plaintiff realleges and incorporates the preceding allegations as though fully set forth herein.

77. Iowa Code Ann. § 714H.3 makes unlawful any, "unfair practice, deception, fraud, false pretense, or false promise, or the misrepresentation, concealment, suppression, or omission of a material fact, with the intent that others rely…[on it]…in connection with the advertisement, sale, or lease of consumer merchandise."

78. By selling Trimboard throughout the State of Iowa and making representations regarding its product related to exterior use, the Defendant has affected commerce and trade

17

within the State.

79.     LP engaged in unfair or deceptive acts or practices in violation of Iowa Code Ann. § 714H.3 when, in selling and advertising the Trimboard for exterior use, LP failed to give Plaintiff and members of the Classes adequate warnings and notices regarding the defect in the Trimboard when used in exterior applications despite the fact that LP knew or should have known of this defect, with the intent that Plaintiff and the members of the Classes would rely upon LP's failure to disclose the defect when purchasing the Trimboard for exterior use. Thus, LP knew of the defective nature of the Trimboard when used in exterior applications and yet continued to sell and distribute them to members of the Classes for exterior use and concealed its known defects from them. LP's acts and omissions possessed the tendency or capacity to mislead or created the likelihood of deception.

80.     LP also engaged in unfair or deceptive acts or practices in violation of Iowa Code Ann. § 714H.3 when it failed to insure that all members of the Classes were provided with an express warranty as owners of structures clad with its defective Trimboard.

81.     Defendant's actions, as set forth herein, were acts related to the advertisement and sale of consumer merchandise and constitute unfair and deceptive trade practices in violation of Iowa Code Ann. § 714H.3.

82.     As a direct and proximate result of these unfair, deceptive and unconscionable commercial practices, Plaintiff and the members of the Classes have been damaged, in that their Trimboard has rotted and led to water leakage and damage to the Trimboard and, upon information and belief, other building components of Plaintiff's and members of the Classes' homes and other structures, including, but not limited to, components installed after initial construction, and Plaintiff and members of the Classes are entitled pursuant to Iowa Code Ann. §

714.H5 to recover actual damages, treble damages and attorney's fees.

83.     Plaintiff's cause of action under Iowa Code Ann. § 714H.1 *et. seq.* accrued on or after July 1, 2009, since Plaintiff did not discover damage to his Trimboard until 2010 and was, therefore, unaware of the Defendant's fraudulent, unfair, or deceptive acts and concealments, or his damages proximately arising therefrom, until, at the earliest, 2010.

84.     On March 6, 2012, prior to filing Plaintiff's original Complaint initiating this proposed class action, counsel for Plaintiff obtained written approval compliant with Iowa Code Ann. § 714.H7 from the Iowa Attorney General's Office, Consumer Protection Division, authorizing Plaintiff to file a class action cause of action pursuant to the Private Right of Action for Consumer Frauds Act. A true and accurate copy of this written approval letter is attached hereto and incorporated fully herein as **Exhibit C** hereto.

### COUNT IV - Breach of Express Warranty

85.     Plaintiff realleges and incorporates each of the preceding allegations as though fully set forth herein.

86.     Defendant entered into contracts with Plaintiff and the Class Members, or Plaintiff's and Class Members' builders and subcontractors and agents to sell Trimboard that was to be installed on structures owned by Plaintiff's and Class Members'.

87.     Defendant expressly warranted its Trimboard against delamination, checking, splitting, cracking and chipping, promising to compensate those experiencing problems at up to twice the original purchase price.

88.     Defendant made this warranty to induce Plaintiffs, Class Members, homeowners, builders, subcontractors and others to purchase or recommend Trimboard, or the warranty was a material factor in the decision of Plaintiffs, Class Members, homeowners, builders,

subcontractors and others to purchase and install Trimboard.

89.     Defendant's Trimboard did not conform to Defendant's express warranty because it contains and suffers from defects because it prematurely deteriorates, rots, swells, buckles, delaminates, absorbs water, warps, and/or bulges under normal conditions and natural, outdoor exposure; causes consequential water and structural damages to both Trimboard and to other building components on the Plaintiff's and Class Member's structures; promotes the growth of mold, mildew, fungi, and insect infestation in the structures in which it is installed, and has caused significant property damage as described more fully herein.    This defect is due to fundamental design, engineering, and manufacturing errors well within Defendant's area of experience and expertise and which is present when the Trimboard leaves Defendant's control.

90.     Defendant's express warranty provides, "[Defendant] will compensate the owner for repair and replacement of the affected trim no more than twice the original purchase price of the affected trim if failure occurs within ten years."

91.     Defendant, however, did not compensate Plaintiff for repair and replacement up to twice the original purchase price for the costs associated with the removal and replacement of the defective Trimboard.

92.     Defendant's failure to compensate Plaintiff for these costs constitutes a breach of express warranty.

93.     Because Defendant's warranty failed to compensate Plaintiff and Class Members for the full costs to repair and replace direct and consequential damages to their structures resulting from the defects in the Trimboard, which were known to Defendant, Defendant's warranty failed of its essential purpose and, therefore, Defendant's warranty with Plaintiff and Class was breached.

94. Because Defendant's warranty failed to compensate Plaintiff and Class Members for the full costs, including both materials and labor, to repair and replace direct and consequential damages to their structures resulting from the defects in the Trimboard, which were known to Defendant, yet Defendant repeatedly and systematically attempted to limit Defendant's legal liability for defects in Trimboard through purported limitations in the warranty requiring that the Trimboard be "properly stored, installed, maintained, and protected", although Defendant knew Trimboard failed regardless of the presence or absence of these conditions, the purported limitations of liability contained in Defendant's warranty were unconscionable.

95. Since Defendant's warranty is unconscionable and/or fails of its essential purpose, Plaintiff and Class Members are entitled to recover their incidental and consequential damages pursuant to Iowa Code §§554.2715 and -2719(2) and (3).

96. As a direct and proximate result of the foregoing, Plaintiff and the Class Members suffered extensive damages (in the form of, inter alia, out-of-pocket expenditures for replacement Trimboard and/or installation of replacement Trimboard) that were directly and proximately caused by the defective design and construction of the Trimboard. Moreover, if Plaintiff and Class Members had known the true facts about the defect in the Trimboard, they would not have purchased it.

## COUNT V - Declaratory Relief

97. Plaintiff realleges and incorporates each of the preceding allegations as though fully set forth herein.

98. Defendant has acted or refuses to act on grounds that apply generally to the Declaratory Relief Class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the Class as a whole within the meaning of Fed. R. Civ. P. 23.

21

99. Plaintiff seeks a ruling that:

a. Trimboard has defects that result in a premature failure when it is used in exterior applications;

b. Any limitation of consumer rights in Defendant's warranty is void as unconscionable;

c. Defendant must notify owners of the defects;

d. Defendant will reassess all prior warranty claims and pay the full cost of repairs and damages; and

e. Defendant will pay the cost of inspection to determine whether any Class member's Trimboard needs replacement.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, together and on behalf of all others similarly situated, prays for a judgment against Defendant as follows:

a. For an order certifying the Classes, pursuant to Fed. R. Civ. P. Rule 23, appointing Plaintiff as representatives of the Classes, and appointing the law firms representing Plaintiff as counsel for the Classes;

b. For compensatory damages sustained by Plaintiff and the proposed Damages Class;

c. For equitable and injunctive relief;

d. For payment of costs of this lawsuit;

e. For pre-judgment and post-judgment interest;

f. For payment of reasonable attorneys fees and expert witness fees;

g. For such other and further relief as this Court may find just and reasonable.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury on all claims so triable.

Respectfully submitted,

Dated: 5/17, 2012

Rob Tully AT0008059
LAW OFFICES OF ROB TULLY, P.C.
2501 Westown Parkway, Suite 1201
West Des Moines, IA 50266
(515) 221-2600 telephone
(515) 225-7549 facsimile
rob@robtullylaw.com
ATTORNEY FOR PLAINTIFF

**Of Counsel**

WHITFIELD, BRYSON & MASON LLP
Daniel K. Bryson (*pro hac vice* admission to be sought)
Scott C. Harris (*pro hac vice* admission to be sought)
Matthew E. Lee (*pro hac vice* admission to be sought)
900 West Morgan Street
Raleigh, North Carolina 27603
Telephone: (919) 600-5000
Facsimile: (919) 600-5035
Email: dan@wbmllp.com
        scott@wbmllp.com
        matt@wbmllp.com

WHITFIELD, BRYSON & MASON LLP
Gary E. Mason (*pro hac vice* admission to be sought)
Nicholas A. Migliaccio (*pro hac vice* admission to be sought)
1625 Massachusetts Ave., NW
Suite 605
Washington, DC 20036
Telephone: (202) 429-2290
Facsimile: (202) 429-2294
Email: gmason@wbmllp.com
        nmigliaccio@wbmllp.com

RHINE LAW FIRM, P.C.
Joel R. Rhine (*pro hac vice* admission to be sought)

Jean S. Martin (*pro hac vice* admission to be sought)
314 Walnut Street
Wilmington, North Carolina 28401-4616
Telephone: (910) 772-9960
Facsimile: (910) 772-9062
Email: jrr@rhinelawfirm.com

BLOCK, CROUCH, KEETER, BEHM
    & SAYED, LLP
Auley M. Crouch, III (*pro hac vice* admission to be sought)
Christopher K. Behm (*pro hac vice* admission to be sought)
PO Box 4
Wilmington, NC 28402
Tel: (910) 763-2727
Fax: (910) 762-6429
Email: acrouch@bcklawfirm.com
       cbehm@bcklawfirm.com

SCHNEIDER & SCHNEIDER
Charles A. Schneider (*pro hac vice* admission to be sought)
Martha B. Schneider (*pro hac vice* admission to be sought)
4616 Butterworth Place, NW
Washington, DC 20016
Tel: (202) 364-8539
Fax: (202) 364-8539
Email: caslawdc@msn.com

## CERTIFICATE OF SERVICE

I hereby declare that on May 2, 2012, I electronically filed the foregoing with the Clerk of Court using the ECF system which will send notification of such filing to the following:

Gregory M. Lederer
Megan R. Dimitt
Lederer, Weston, Craig, PLC
Suite 700, Higley Bldg.
118 3rd Ave S.E.
Cedar Rapids, IA, 52406-1943

John Parker Sweeney
T Sky Woodward
Womble Carlyle Sandridge & Rice, LLP
250 West Pratt St., Ste 1300
Baltimore, MD, 21201

James Weatherholtz
Womble Carlyle Sandridge & Rice, LLP
5 Exchange Street
Charleston, SC 29401

*/s/ Robert G. Tully*
Robert G. Tully